1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3  DERRICK RANKINE,                  )
               Plaintiff            )
4                                    )
          v.                        )      CIVIL ACTION NO. 04-100 ERIE
5                                    )
   SUPERINTENDENT FOLINO, et al.,    )
6            Defendants              )

7

8    <u>HEARING ON PLAINTIFF'S MOTION FOR PROTECTIVE ORDER/TRO</u>

9

10                 Proceedings held before the HONORABLE

11             SUSAN PARADISE BAXTER, U.S. Magistrate Judge,

12             in Judge's Chambers, U.S. Courthouse, Erie,

13             Pennsylvania, on Monday, December 20, 2004.

14

15

16

17  <u>APPEARANCES</u>:
                    DERRICK RANKINE, Plaintiff herein, (via Phone),
18                  appearing Pro Se.

19                  ROBERT ENGLESBERG, Esquire, Deputy Attorney
                    General, (via Phone), appearing on behalf of
20                  the Defendants.

21

22

23

24                              - - -

25

2

P R O C E E D I N G S

        (Whereupon, the proceedings began at 2:46 p.m., on
Monday, December 20, 2004, in Judge's Chambers.)


        THE COURT:  All right, let me call the case.  This
is Civil Action No. 04-100 Erie.  Rankine v. Superintendent
Folino, et al.  We're here on a continuation of the hearing
from last week on the motion for protective order -- I'm sorry,
emergency order for TRO.  In my office I have my staff
attorney, Frank Fogl, Esquire, and the court reporter.  Will
everybody identify themselves for the record, please?
        MR. ENSY:  Do you want inmate Rankine on the line at
this point?
        THE COURT:  Sure.
        MR. RANKINE:  This is Derrick Rankine.
        THE COURT:  This is Judge Baxter and I have my staff
attorney and the court reporter with me, we're going to
identify who else is on the line?
        MR. ENGLESBERG:  Judge, Robert Englesberg
representing the defendants.  Also on the line is Dan Davis, he
is there with a number of officers and officials.  Would you
like them identified, your Honor?
        THE COURT:  Yes, please.
        MR. ENGLESBERG:  Captain Grady.  Lieutenant Green.

1   David Sacks.  Officer Engelhardt.  Counselor Eiben.  Officer

2   Stickles.  Officer Thompson.  Officer Blaker.  Officer

3   Henderson.

4           THE COURT:  All right.  Mr. Rankine, you are on a

5   hand-held phone so that the officer with you cannot hear the

6   whole conversation?

7           MR. RANKINE:  Yes, your Honor.

8           THE COURT:  All right.  Now, I asked, as you recall

9   last week, Mr. Rankine, I asked Mr. Englesberg to see what he

10  could find out because it was impossible for me to decide on

11  your motion when all these facts were disputed.  I didn't have

12  any other folks here to testify.  So I suggested affidavits,

13  Mr. Englesberg said there were so many people involved it would

14  be easier to do it on the record.  Mr. Englesberg, can I start

15  with you?

16          MR. ENGLESBERG:  Sure.

17          THE COURT:  Why don't you tell me what you've

18  assembled?

19          MR. ENGLESBERG:  Well, I would have initially

20  Officer Blaker discuss the allegations in grievance number

21  99026.  Mainly that Officer Blaker allegedly slammed the

22  plaintiff into the wall and broke his dentures.  Officer Blaker

23  has told me that is absolutely false.  And he is on the line.

24          THE COURT:  All right.  Well, let me talk to you.

25  Officer Blaker?

4

1          MR. BLAKER:  Yes, ma'am.

2          THE COURT:  Why don't you raise your right hand,

3    sir.

4          (Whereupon, Correctional Officer Blaker was sworn.)

5          THE COURT:  Mr. Englesberg, do you want to question

6    him or do you want him to tell me just what happened?

7          MR. ENGLESBERG:  That's fine, I'd be happy to

8    question him.

9          THE COURT:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. ENGLESBERG:

12   Q.    Officer, how long have you been at the State Correctional

13   Institution at Greene?

14   A.    About three and a half years.

15   Q.    Are you working in the RHU?

16   A.    Yes.

17   Q.    Inmate Rankine has alleged that on October 1st, I'm

18   sorry, he alleges he was taken to the dentist on October 1st

19   because back on August 15th of 2004 you allegedly slammed him

20   into a wall and broke his dentures, did that ever happen?

21   A.    No, sir.

22   Q.    Have you ever had any physical altercation with inmate

23   Rankine?

24   A.    No, I haven't.

25          MR. ENGLESBERG:  Nothing further, your Honor.

5

1              MR. RANKINE:  Could I ask Mr. Blaker some questions?

2              THE COURT:  It's your turn, sir, go ahead.

3                         CROSS-EXAMINATION

4    BY MR. RANKINE:

5    Q.    Mr. Blaker, did you and Officer Stickles remove me from

6    my cell?

7    A.    No.

8    Q.    You didn't remove me from my cell, officer?

9    A.    No.

10   Q.    Okay, Mr. Blaker.  While I filed a grievance that you

11   pushed me in the door entrance on the pod at my cell door and

12   break my dentures -- did you not tell me that you're not taking

13   me to a sick call, I'm not seeing a doctor?

14   A.    No.

15             MR. RANKINE:  You didn't.  I would like to call --

16             THE COURT:  Well, you'll have your chance, right now

17   we're examining this fellow.  You'll have other folks there

18   that you can question.  Why don't you ask C.O. Blaker all the

19   things you want to, when you're done, we'll have the others

20   examined.  All right, anything else you want to ask Mr. Blaker?

21             MR. RANKINE:  No, ma'am.

22             THE COURT:  All right.  Anything else, Mr.

23   Englesberg?

24             MR. ENGLESBERG:  Yes, your Honor.  Mr. Davis, are

25   you there?

6

1          MR. DAVIS:  Yes.

2                    DIRECT EXAMINATION

3   BY MR. ENGLESBERG:

4   Q.    Mr. Davis, your position at SCI-Greene is you're the

5   superintendent's assistant, is that correct?

6   A.    That's correct, sir.

7   Q.    How many grievances does inmate Rankine have on file

8   there?

9   A.    I have a record of -- 191 since January the 21st, I

10  believe, 2004.

11  Q.    Is that when he was transferred to Greene?

12  A.    He came to Greene I believe on January 21st.  I received

13  a grievance on 1/21/04.

14          THE COURT:  I think he's given me copies of all of

15  those.  Are these grievances generally answered or are they not

16  answered?

17          MR. DAVIS:  They were generally not answered.  And

18  it's due to the fact that he's been informed he needs to

19  correspond with DOC by the name that he was incarcerated under.

20  He continually adds and "e" to his name, which he was not

21  incarcerated under that name, he was incarcerated under the

22  name of Rankin, without the "e".

23  BY MR. ENGLESBERG:

24  Q.    Have you informed him in order to get a response to his

25  grievances, he would have to use his incarcerated name?

7

1    A.    Numerous times.  I even had an extra effort to have it

2    written on the reject form, which is not normally done.

3    Grievances are processed, even though he uses the wrong name,

4    if it is of assault nature or a serious issue, being assaulted.

5    Q.    All right.  This is grievance number 99945 that I'd like

6    to bring to your attention.  It's dated 10/22/04.  And in this

7    grievance he complains that he was given food, I believe he

8    said he was given a cup of coffee with spit in it.  And then he

9    had a lunch tray with bread that was loaded with spit.  And

10   that as a result of this, towards the bottom of the grievance,

11   he said he vomited all day and night.  Do you have inmate

12   Rankine's medical records there?

13   A.    I have a portion of his records information here with me.

14   Q.    Do they go up to October 22nd and October 23rd?

15   A.    I've gotten entries from August the 5th of 2004 all the

16   way to 12/14/04.

17   Q.    Okay.  Now, is there anything indicating that on 10/22 or

18   10/23, that he complained to medical about being sick and

19   throwing up?

20   A.    Nothing indicated, sir.  From 10/28, both entries that

21   were made in medical were his request to have his meds renewed.

22   Requesting an appointment.  Motrin.  Blood work to be done.

23   Q.    Did you also indicate that you had his medical records

24   from August there?

25   A.    Yes, back to August the 5th.  He had an EKG done.

1    Q.    Let me ask you specifically about August 15th, that's the

2    day that he alleges that Officer Blaker slammed him up into

3    doors and broke his dentures?

4    A.    No injury made on that date or even around that date in

5    the medical file that he had been seen by medical staff.  On

6    the 9th he was seen, of August, and on the 16th he was seen by

7    Dr. Conn, he was seen by medical, he was renewing his meds.

8    He was seen by the psychiatrist, we have that in the medical.

9    The 17th was again request for meds.  9/10 was the entry, the

10   medications were re-ordered again.

11   Q.    There was nothing around that time complaining about

12   broken dentures?

13   A.    Nothing I could see in medical records, no, sir.

14           MR. ENGLESBERG:  Do you have any questions, Mr.

15   Rankine?

16           MR. RANKINE:  Yes, sir.

17                    CROSS-EXAMINATION

18   BY MR. RANKINE:

19   Q.    Mr. Davis, have you ever talked to me through my cell

20   door and looked on court documents to see what name I was

21   incarcerated under?

22   A.    I don't know that I've ever come to your door.  I've

23   looked in your files and everything there.  Which indicate you

24   were incarcerated under the name Rankin, R-a-n-k-i-n.

25   Q.    Mr. Davis, the question is did you ever try to speak to

1    me and let me show you all the court documents from the

2    Philadelphia Common Pleas Court, Philadelphia Superior Court to

3    see what name I'm incarcerated under?

4    A.    I checked and went through in the past all the records we

5    have.

6    Q.    Sir, did you speak to me, that's the question?

7    A.    I've spoken to you in the past, I don't know --

8    Q.    Excuse me, Mr. Davis, you're lying.

9         THE COURT:  You don't harass the witness, he answers

10   your questions, if you don't agree, you tell me about it later.

11   BY MR. RANKINE:

12   Q.    Mr. Davis -- did I show you a letter from Judge Means two

13   weeks ago with my name spelled R-a-n-k-i-n-e?

14        THE COURT:  Did Judge Means sentence you, sir?

15        MR. RANKINE:  Yes, ma'am.  Judge Means was my trial

16   judge, sentencing judge, he was the PCRA judge.

17        THE COURT:  All right.

18        MR. DAVIS:  When you were classified into Camp Hill,

19   your name, as you gave it to them, as it is indicated on your

20   classification sheet, your 16e, indicates you're incarcerated

21   under Derrick Rankin, R-a-n-k-i-n.  It's listed on there, your

22   true name is R-a-n-k-i-n.  There's also listed on there another

23   a/k/a that you're known by.

24   BY MR. RANKINE:

25   Q.    Mr. Davis, Judge Baxter and the Attorney General have

10

1   documents that I was a candidate for the Philadelphia police

2   and the state police, I worked as operations manager for a

3   security company.

4           THE COURT:  Mr. Rankine, do you have a question?

5           MR. RANKINE:  Yes, ma'am.

6   BY MR. RANKINE:

7   Q.    Mr. Davis, did you ever try to speak to me about showing

8   you any documentation that this name you have was given to me

9   at SCI-Somerset to prove to you that in Camp Hill my name was

10  spelled Rankin, I corrected the name, given you knew I had been

11  transferred by the grievance I filed at Albion, my name was

12  spelled R-a-n-k-i-n-e.  Which everyone responded to.  And until

13  I went to Somerset, my name was never spelled R-a-n-k-i-n-e,

14  sir?

15  A.    All the records in your DC-15 that are maintained by the

16  Department of Corrections you are listed as R-a-n-k-i-n.

17          THE COURT:  Enough about that questioning, do you

18  have anything further of Mr. Davis?

19          MR. RANKINE:  Yes, your Honor, I have one question

20  for Mr. Davis.

21  BY MR. RANKINE:

22  Q.    Mr. Davis, when did I arrive at SCI-Greene?

23  A.    The date that you came up, medical said you were received

24  on 1/21/04.

25  Q.    Okay.  That's incorrect, I came here on the 25th.

11

1  Another question, Mr. Davis.  You said I did not file a

2  grievance that alleged that Blaker pushed in my door --

3  A.    I did not say you didn't file one.  I wasn't asked that

4  question.

5        THE COURT:  You didn't send me a copy of it, I only

6  have one for 8/14 where you complained about spit in your

7  coffee.

8        MR. DAVIS:  Your Honor, the August 15th

9  misconduct -- the grievance has not been responded to yet.

10       THE COURT:  There isn't one for 8/15?

11       MR. RANKINE:  Your Honor, I did not complete my

12  administrative remedies.  When I filed the grievance, they only

13  sent me back the pink part.  I can't make copies of that, I was

14  waiting for a response, he has not responded as of yet.  I have

15  not received his responses, that's the reason why I did not

16  send it to you yet.

17       THE COURT:  The ones you gave me are pink and

18  yellow, they're not Xeroxed copies.

19       MR. RANKINE:  I know, your Honor.

20       THE COURT:  All right.  Do you have any other

21  questions for Mr. Davis.

22  BY MR. RANKINE:

23  Q.    Mr. Davis, to your recollection, did you receive a

24  grievance from August 15th from me?

25  A.    On August the 15th?

12

1    Q.    Yes, sir.

2    A.    No, I did not.

3    Q.    You did not?

4    A.    I have one received after, actually, there's three

5    received on August 16th.  One was for conditions, one was for

6    food.

7    Q.    Mr. Davis, one more question.  You said there is no

8    record of me complaining on August 15th, filing a sick call

9    slip to medical?

10   A.    The records I have here show that we received them on the

11   16th, I don't know what the grievances were dated.

12          THE COURT:  Mr. Davis, he was asking you about sick

13   call on the 15th?

14          MR. DAVIS:  I'm looking, I got one dated the 16th

15   that was received.  No, the 13th, 14th and 20th -- August the

16   16th he was not seen -- request was for medication to be

17   removed.

18          MR. RANKINE:  Your Honor, I sent the court copies of

19   sick call slip that I filed on August 15th.

20          THE COURT:  Were you seen in sick call?

21          MR. RANKINE:  No, ma'am, I was never seen.  I was

22   not seen at all.  I was sent Motrin.  Motrin was increased to

23   1,800 milligrams.

24          THE COURT:  When did you get replacement dentures?

25          MR. RANKINE:  October 1st.

13

1              THE COURT:  All right.  Any other questions, Mr.

2    Englesberg, for Mr. Davis?

3              MR. ENGLESBERG:  Yes.

4                    REDIRECT EXAMINATION

5    BY MR. ENGLESBERG:

6    Q.    Is there any indication in his medical file that he

7    complained on or about August 15th about his dentures being

8    broken?

9    A.    No, nothing in his medical file.  On August the 15th an

10   EKG -- August the 9th he was seen.  August the 16th he was not

11   seen because the request was to renew his Motrin.  On 8/17, the

12   same thing, was in response to his medication.

13   Q.    When was the next time he was seen?

14   A.    9/10.

15   Q.    Was that the next time that he requested to be seen by

16   medical?

17   A.    This is the next time there is an entry in the file, yes.

18              MR. ENGLESBERG:  Nothing further, your Honor.

19                    RECROSS-EXAMINATION

20   BY MR. RANKINE:

21   Q.    Mr. Davis, can I ask you a question?

22   A.    Yes, sir.

23   Q.    You say I was taken to get an EKG since I've been to

24   SCI-Greene?

25   A.    I didn't hear you too well.

14

1    Q.    You said I received an EKG since I've been in SCI-Greene,

2    sir?

3    A.    Yes.

4    Q.    Sir, I have never --

5              THE COURT:  Do your records show when he had an EKG?

6              MR. DAVIS:  On 8/5.

7              MR. RANKINE:  Your Honor, I have never received an

8    EKG since I've been incarcerated.

9              MR. DAVIS:  It was scheduled and canceled.  You had

10   an EKG scheduled for 8/5.  We were looking for an 8/15 date.  I

11   asked for anything that related to around the 8/15 date.  And

12   that's what we started with, August the 5th, that is irrelevant

13   whether you saw them for an EKG, that's 10 days before the

14   incident allegedly occurred.

15             THE COURT:  Who else do you have there, Mr.

16   Englesberg?

17             MR. RANKINE:  Mr. Davis does lie on the record, I

18   didn't receive one since I've been in prison, I've been

19   asking --

20             THE COURT:  That's your charge.  Go ahead, Mr.

21   Englesberg.

22             MR. ENGLESBERG:  Hold on one moment, your Honor.

23                      DIRECT EXAMINATION

24   BY MR. ENGLESBERG:

25   Q.    Officer Engelhardt.

1    A.    Yes, sir.

2    Q.    I just have a couple of questions.  There is a grievance,

3    I believe it's dated October 8th, let me try to find that.

4    I'll get you the number of it.  October 8th, the grievance

5    number is 98477.  It indicates that he was denied access, that

6    inmate Rankine was denied access to the yard by yourself and

7    Officer Jones?

8              THE COURT:  Who are you speaking to right now?

9              MR. ENGLESBERG:  Officer Engelhardt.

10             THE COURT:  Officer Engelhardt, raise your right

11    hand.

12             (Whereupon, Correction Officer Englehardt was

13    sworn.)

14             THE COURT:  You may continue.

15                     DIRECT EXAMINATION

16    BY MR. ENGLESBERG:

17    Q.    Officer Engelhardt, do you presently work in the RHU at

18    SCI-Greene?

19    A.    Yes, sir.

20    Q.    How long have you been employed at Greene?

21    A.    Little over six years.

22    Q.    Have you had a chance to look at this grievance that I

23    referred to, grievance number 98477, allegedly denying inmate

24    Rankine access to the yard?

25    A.    I'm looking at it right now.

16

1          THE COURT:  The court has a copy, I'm looking at it,

2    too.

3    BY MR. ENGLESBERG:

4    Q.    Do you know what initials are at the top, F/B?

5    A.    That's the pods, F block, B pod.

6    Q.    Do you have any recollection about allegedly denying

7    Rankine access to the yard for exercise?

8    A.    On that day he didn't sign up for yard.

9    Q.    Do you have to sign up in order to go to the yard?

10   A.    Yes.

11   Q.    Have you ever denied this inmate access to the yard?

12   A.    If he doesn't comply with procedures, like I explained to

13   you earlier.

14   Q.    What type of procedures?

15   A.    That if he signs up, we go to his door, he's supposed to

16   be standing there in his boxers with clothes in hand so when

17   you open the wicket, he hands the clothes out, you strip search

18   him and hand him his clothes back and gets ready.

19   Q.    If he doesn't have his clothes ready, if he's not at the

20   wicket, he doesn't go to the yard that day?

21   A.    No, sir.

22   Q.    Has that happened on occasion with inmate Rankine?

23   A.    Yes, sir.

24          MR. ENGLESBERG:  All right.  Your witness, inmate

25   Rankin.

17

1                           CROSS-EXAMINATION

2   BY MR. RANKINE:

3   Q.    Offer Engelhardt, when you denied me access to the yard,

4   have I ever asked you to call the lieutenant?

5   A.    No.

6   Q.    Have I ever asked you to call the sergeant?

7   A.    No, because the sergeant is there.

8   Q.    Officer Engelhardt, did you give me a cup of coffee this

9   morning?

10  A.    I believe I was asked about the yard.

11  Q.    Did you give me a cup of coffee this morning, Officer

12  Engelhardt?

13  A.    Not according to this.

14  Q.    You did not work the S pod this morning?

15  A.    Yes, I was there.

16  Q.    Did you give me a cup of coffee this morning?

17  A.    May I ask, I believe your question was about the yard.

18  Q.    Sir, I'm asking you?

19          THE COURT:  Answer the question, Officer Englehardt.

20          MR. ENGELHARDT:  Yes, I did.

21  BY MR. RANKINE:

22  Q.    I told you there was spit in the cup of coffee?

23  A.    No, not until I come to pick up the trays.

24  Q.    Officer Engelhardt, before you leave the building, did I

25  open the coffee and tell you there was spit in the coffee and I

18

1    asked you to call the sergeant?

2    A.    No, you didn't.

3    Q.    Did I ask you to call the sergeant?

4    A.    No, you didn't.

5    Q.    Did I tell you to call the lieutenant?

6    A.    No, you didn't.

7         THE COURT:  I have a question for the officer.

8    Officer, did you look into the coffee, was there spit in it?

9         MR. ENGELHARDT:  I didn't see anything in there.

10   Just what bubbles, there usually are bubbles if you pour

11   coffee, leave little bubbles around the coffee.

12        THE COURT:  Officer, did you spit in the coffee this

13   morning?

14        MR. ENGELHARDT:  No, ma'am.

15   BY MR. RANKINE:

16   Q.    Officer Engelhardt, when you looked in my coffee, did you

17   not see white bubbles in the coffee?

18   A.    No, not white bubbles.

19   Q.    What color was the bubbles?

20   A.    Regular coffee bubbles.

21   Q.    You don't know what color it was?

22        THE COURT:  Mr. Rankine, he already answered the

23   questions about the coffee, he said he didn't see spit, he

24   couldn't make out any spit, he did not spit in the coffee.  Do

25   you have any other questions for him?

1        MR. RANKINE:  Yes, ma'am.

2   BY MR. RANKINE:

3   Q.    Officer Engelhardt, how long have I been on your block,

4   to your recollection?

5   A.    On the block?

6   Q.    Yes, S/P pod?

7   A.    I couldn't tell you.

8   Q.    You don't recall?

9   A.    No, I don't.

10  Q.    Officer Engelhardt, how many times have I been allowed to

11  go to the yard?

12  A.    I don't know that.

13  Q.    You don't know that?

14  A.    No, sir.

15  Q.    You cannot recall how many times I've been allowed to go

16  to the yard?

17  A.    No, I haven't.

18  Q.    Officer Engelhardt --

19  A.    Yes.

20  Q.    When you come up to the pod to pick up mail, does the

21  inmate have to be standing up at their cell door with the light

22  on?

23  A.    No.

24  Q.    No.  Officer Engelhardt, have you ever entered S/P pod

25  and Mr. Rankine was not at his cell door?

20

1   A.    Yes.

2   Q.    You're seeing Mr. Rankine is not at his cell door?

3   A.    No, not all the time.

4   Q.    Officer Engelhardt, how many times have you ever denied

5   Mr. Rankine meals?

6   A.    I can't recall that.

7   Q.    You can't recall it?

8   A.    No, only when your lights are not on and you're not

9   standing at your door.

10  Q.    Has that ever happened, sir?

11  A.    Yes.

12  Q.    Officer Engelhardt, you denied 17 meals since I've been

13  at S/P pod since August 14th to now?

14          THE COURT:  Do you agree with that?

15          THE WITNESS:  No, ma'am.

16  BY MR. RANKINE:

17  Q.    Officer Engelhardt, you said if I follow the procedure, I

18  go to the yard, is that correct?

19  A.    Yes.

20  Q.    Did you come on the pod this morning to take inmates out

21  to the yard?

22  A.    There was no yard this morning.

23  Q.    Did you tell me what would happen tomorrow morning about

24  the yard?

25  A.    No.

21

1   Q.   You didn't say anything?

2   A.   No.

3   Q.   You didn't tell me that I'm not going to the yard

4   tomorrow?

5   A.   No, I did not.

6        THE COURT:  All right, that's enough, we're off the

7   point here.  Mr. Englesberg, anything else?

8        MR. ENGLESBERG:  Judge, there is a grievance

9   concerning this officer I'd like to ask him just one or two

10  questions about it, I just found this grievance.

                REDIRECT EXAMINATION

11  

12  BY MR. ENGLESBERG:

13  Q.   Officer, is your named pronounced Engelhardt?

14  A.   Engelhardt, the "d" is silent.

15  Q.   There is a grievance dated 10/2/04, it doesn't have a

16  grievance number, but it states that -- it's in the back of the

17  packet of grievances that were filed in the case.  I'd like to

18  read it to you if you don't have a copy of it, it's a fairly

19  short grievance.  10/2 is the date.  It says, Inmate Rankine

20  says my first name is on my cell door.  And that you've been

21  using his first name to address him, he doesn't like it.  Is

22  there any validity to these allegations, are inmate's first

23  names on their cell doors as a matter of course?

24  A.   Yes, they are.  For their mug shot, their door card has

25  first and last name and their picture.

22

1    Q.    Do you address him by his first name even though he

2    doesn't like to be called by his first name?

3    A.    No, sir.

4    Q.    How do you address him if you do?

5    A.    Inmate Rankine.

6    Q.    "On Friday 10/1/04 Officer Engelhardt used my first name

7    and this caused me to vomit."  Do you have any recollection of

8    that?

9    A.    No, sir.

10            MR. ENGLESBERG:  Your witness.

11                    RECROSS-EXAMINATION

12    BY MR. RANKINE:

13    Q.    Officer Engelhardt, did I go to the yard on October 1st?

14    A.    Yes, you did.

15    Q.    Officer Engelhardt, you did not call me by my first name,

16    is that correct, on October 1st?

17    A.    That's correct.

18    Q.    That's correct?

19    A.    I did not.

20    Q.    I did file a grievance, you said you didn't call me by my

21    first name.  Why didn't you charge me with lying to staff --

22    have I ever been charged with lying to staff or lying to staff

23    in the DOC, can you recall, sir?

24    A.    I can't recall.

25    Q.    Have any staff member, to your knowledge --

23

1            THE COURT:  Let's just get off of this because,

2    quite honestly, there's no constitutional problem with him

3    calling you by your first name.  Let's move on to something

4    else.  He can pretty much call you anything.

5            MR. RANKINE:  I agree with that, your Honor.  He's

6    lying, he did call me by my first name.

7            THE COURT:  That's your charge, he's under oath.  Go

8    ahead.

9    BY MR. ENGLESBERG:

10   Q.    I have another grievance dated 10/2 --

11           MR. RANKINE:  Can I go back to my cell and get these

12   grievances, I have to go by memory without them in front of me?

13           THE COURT:  No, we can't do that right now.  You're

14   just cross-examining anyway, you ask questions on what's he's

15   been questioned on.  If you'd like us to read the whole thing,

16   we'll read the whole thing to you.

17           MR. RANKINE:  I would like that, your Honor, I don't

18   have anything before me.

19           THE COURT:  All right.  I haven't found it yet, hold

20   on.

21           MR. RANKINE:  Your Honor, I would ask the court to

22   excuse me for about 10 minutes, five minutes, to run to my cell

23   to use the toilet and come back out.

24           THE COURT:  How far away is that -- is there a

25   correctional officer there?

24

1          MR. RANKINE:  Yes, ma'am.

2          THE COURT:  I really wouldn't allow that in my

3   courtroom.  You wait until we're ready.  Go ahead, Mr.

4   Englesberg, have you found it yet?

5          MR. ENGLESBERG:  I haven't found it.  Have you

6   threatened to retaliate against him for filing lawsuits against

7   individuals at Albion and at Somerset, as well as Greene?

8          THE COURT:  I found another one on 10/2.  I don't

9   know if it's about that.  Never mind, go ahead.

10  BY MR. ENGLESBERG:

11  Q.    Officer Engelhardt, have you ever threatened to retaliate

12  against him for filing lawsuits?

13  A.    No, sir.

14         THE COURT:  May I ask a question, Mr. Englesberg?

15         MR. ENGLESBERG:  Sure.

16         THE COURT:  Mr. Engelhardt, is Mr. Rankine the only

17  person at SCI-Greene who's ever filed a grievance or filed a

18  lawsuit against you?

19         MR. RANKINE:  Your Honor, I need to run.

20         THE COURT:  You go at your own risk.  Did you

21  respond, Mr. Engelhardt?

22         MR. ENGELHARDT:  No, ma'am.  Other inmates have.

23         THE COURT:  Sergeant Ensy, did you want to say

24  something?

25         MR. ENSY:  The inmate went back to his cell to use

1    the restroom.  He's not to bring anything back with him, is he?

2            THE COURT:  I told him I would read them for him.

3    Do you have any other questions, Mr. Englesberg?

4            MR. ENGLESBERG:  Not with Officer Engelhardt.

5            MR. RANKINE:  I'm back on the line, your Honor.

6            THE COURT:  Mr. Rankine, you can question him on

7    that issue of retaliation.

8    BY MR. RANKINE:

9    Q.    Officer Engelhardt, you said you never threatened me?

10   A.    Never have.

11   Q.    Never have?

12   A.    No.

13   Q.    Did you work February 24th at S/P pod?

14   A.    I was working that day.

15   Q.    Did I file a grievance against you -- you have no idea I

16   filed a grievance?

17   A.    No.

18   Q.    You mean Mr. Davis did not see you about my filing a

19   grievance where you threatened to put nine bullets in my head?

20   A.    No.

21           THE COURT:  Mr. Englesberg, do you have any other

22   questions of Mr. Engelhardt?

23           MR. ENGLESBERG:  No, ma'am.

24           THE COURT:  Do you have anyone else that you wish to

25   testify today?

26

1        MR. ENGLESBERG:  Yes, briefly Officer Stickles.

2        (Whereupon, Officer Stickles was sworn.)

3                    DIRECT EXAMINATION

4   BY MR. ENGLESBERG:

5   Q.    You're an officer in the RHU unit at SCI-Greene, Officer

6   Stickles?

7   A.    I was.  Currently I'm in another position.

8   Q.    Up until what date did you work in the RHU,

9   approximately?

10  A.    Middle of August, end of August.

11  Q.    Have you been back to the RHU since then?

12  A.    From time to time.

13       MR. ENGLESBERG:  Grievance 10/8, I'm trying to find

14  it at this point, your Honor.

15       THE COURT:  I remember one along the lines where he

16  requests separation from Stickles, is that correct?

17       MR. STICKLES:  There may have been.

18  BY MR. ENGLESBERG:

19  Q.    Inmate alleges that you told him, along with Sergeant

20  Tanner, yourself, Officers Coy and Henry, to stop filing

21  grievances and to withdraw all lawsuits; did that ever occur?

22  A.    No.

23  Q.    You never had that conversation with inmate Rankine

24  concerning that?

25  A.    No, I did not work on that block that day, I did not have

27

1    that conversation.

2              MR. ENGLESBERG:  Nothing else, your Honor.

3              THE COURT:  Mr. Rankine, it's your turn.

4                        CROSS-EXAMINATION

5    BY MR. RANKINE:

6    Q.    Mr. Stickles, did you threaten me?

7    A.    No.

8    Q.    Did you ever give me a high protein tray?

9    A.    Did I ever give you a high protein tray -- no, not that I

10   know of.

11   Q.    You never charged me with lying to staff?

12   A.    I don't have all the misconducts in front of me, but not

13   that I can remember.

14   Q.    You never charged me with instituting a riot?

15   A.    I didn't understand.

16   Q.    You never charged me with instituting a riot?

17   A.    Like I said, I don't have all the misconduct reports

18   in front of me, but not that I can remember.

19   Q.    You can't recall ever charging me with lying?

20   A.    Like I said, I don't have all the misconduct reports in

21   front of me, but not that I can remember.

22   Q.    Mr. Stickles -- were you ever spoke to about making

23   homosexual demands of me and giving me a high protein tray?

24   A.    No.

25   Q.    How many grievances have you had filed on you, Mr.

1  Stickles?

2  A.    I don't know, I'm not aware of that number.

3  Q.    You never charged me with lying to staff, is that

4  correct?

5  A.    As I answered, I don't have the misconducts in front of

6  me, I do not remember.

7          THE COURT:  Can I ask a question of Officer

8  Stickles.  Are you informed every time an inmate files a

9  grievance with your name in it?

10         MR. STICKLES:  No, ma'am.

11 BY MR. RANKINE:

12 Q.    Officer Stickles, did you assault me on June 24th?

13 A.    No.

14 Q.    Did you give me my medication forcibly on June 24th?

15 A.    I did give medication out, but it was not forcibly.

16 Q.    How did you give it to me, Mr. Stickles?

17 A.    When you asked for medication, you opened your hand and I

18 gave you the medication that you should have taken.

19 Q.    Was both my hands cuffed?

20 A.    Was both your hands --

21 Q.    Handcuffed?

22 A.    No, you weren't uncuffed -- you were cuffed up.

23 Q.    Was I coming from my hearing that you gave me a

24 misconduct for urinating out my door?

25 A.    I don't know where you were coming from.

1    Q.    You don't recall being in the room when they asked you to

2    testify you saw me urinate on my door --

3    A.    I do not recall where you were coming from.

4    Q.    You do not recall I was to be uncuffed?

5    A.    That's correct.  If you were out of your cell, you would

6    be placed in handcuffs.

7    Q.    In the RHU?

8    A.    That's correct.

9    Q.    You just said I was uncuffed when I took the medication

10   out of my hand?

11   A.    I just said you were not uncuffed.

12   Q.    I was not uncuffed?

13   A.    You had cuffs on the entire time.

14          THE COURT:  Mr. Rankine, he has been testifying you

15   were in fact in handcuffs at the time.

16   BY MR. RANKINE:

17   Q.    I filed a grievance that you hurt my arm, shoulder --

18          THE COURT:  Did you know he filed that grievance,

19   Mr. Stickles?

20          MR. STICKLES:  No, ma'am.

21   BY MR. RANKINE:

22   Q.    So you're saying that you were never told I filed

23   grievances?

24   A.    That is correct.

25   Q.    No one ever told you about those grievances?

30

1    A.    That is correct.

2    Q.    And when the grievances were returned to me, you were the

3    pod officer, is that correct?

4    A.    June 24th was the date you're talking about?

5    Q.    Yes, sir, you were pod officer on June 24th?

6    A.    Yes, I was.

7    Q.    As the pod officer you would have gave out grievances, is

8    that correct?

9    A.    That's possible.  Somebody else could have passed the

10   mail out that day.

11          THE COURT:  Do you have any personal recollection at

12   this time about June 24th?

13          MR. STICKLES:  No, ma'am.

14          THE COURT:  Is there anything else that you wish to

15   ask, Mr. Englesberg?

16          MR. ENGLESBERG:  No, your Honor.

17          THE COURT:  Is he your last witness?

18          MR. ENGLESBERG:  Yes, I think we covered enough,

19   your Honor.

20          THE COURT:  All right.  Mr. Rankine, are you willing

21   to go under oath?

22          MR. RANKINE:  Yes, ma'am.

23          THE COURT:  Raise your right hand, please.

24          (Whereupon, the Plaintiff, Derrick Rankine, was

25   sworn.)

31

THE COURT:  Is there anything you would like to ask
him, Mr. Englesberg?

MR. ENGLESBERG:  Yes, your Honor.

CROSS-EXAMINATION

BY MR. ENGLESBERG:

Q.    Are you aware that grievances are not being processed
because you're not using your incarcerated name?

A.    No, sir, I'm using my incarcerated name, sir.

Q.    Are you aware that grievances are not being looked into
because of that fact, are you aware that grievances are not
being processed?

A.    Yes, sir.

Q.    Are you aware that all of the grievances have not been
processed?

A.    Yes, sir.

Q.    Then why are you asking officers if they've seen those
grievances?

A.    Why am I asking them, sir?

Q.    Yes.

A.    Because they're the ones that give me back the grievance,
normally tell me before they give it to me.  And they normally
tell me they're not being done because I'm this and that, I'm
mentally ill and I'm crazed.  I said we'll see.  Officer
Stickles is the pod officer.  I'd like to go on record as
saying whenever a grievance is handed back to the inmates,

32

1    they're stapled shut with their name on top of them.

2    Q.    Is that correct, inmate Rankine, it's true that officers

3    don't read your mail, isn't that right?

4    A.    No, sir, they read my mail and tell me what's in there.

5    Q.    When they bring it to you cell?

6    A.    Yes, sir, they tell me days later -- what was in my mail.

7         THE COURT:  I have a question.  Mr. Rankine, what is

8    it about you that all of these officers are so interested in

9    harassing you when in fact many, many inmates are filing suits

10    against them, what is it about you that causes the behavior you

11    allege happens?

12         MR. RANKINE:  Well, your Honor, I love to sing

13    Christian songs and they come to disrespecting them.  So they

14    do things to get me to stop singing my Christian songs and try

15    to get me to stop reading my Bible.  They do disrespect me full

16    force, they don't like that.  I won't shut up with the things

17    they do on the pod, when they abuse inmates, I speak up.  And

18    because I'm that type of person, they don't like me.  They call

19    me a faggot, homosexual -- homosexual demands.  I consistently

20    tell them I'm a Christian, I'm not a homosexual.  I'm going to

21    sing my gospel songs three times a day, read my Bible study

22    work.

23         THE COURT:  Mr. Rankine, do you have any physical

24    illnesses that you're being treated for?

25         MR. RANKINE:  At this time, your Honor?

33

1          THE COURT:  Yes.

2          MR. RANKINE:  No, your Honor.

3          THE COURT:  Do you have any psychological illnesses

4   that you're being treated for?

5          MR. RANKINE:  No, ma'am.  Your Honor, this morning,

6   yesterday morning, I was given a cup of coffee with spit in it.

7   And this morning, I asked Dr. Conn this morning, I asked to get

8   me antidepressants back, they've not given them back to me.  I

9   have no mental illnesses.  I told Dr. Conn this morning I could

10  only get -- because when I was on the street, I used to take

11  Zoloft as an antidepressant.  Since I came in here, they cut it

12  off.  Okay, now there is spit in my coffee, again, I have to

13  stop drinking.  Again, I asked them for an antidepressant.  Dr.

14  Conn told me I have no mental illness, they're not giving it to

15  me.

16         DR. SACKS:  Your Honor --

17         THE COURT:  Please identify yourself for the record?

18         DR. SACKS:  My name is David Sacks, I'm a

19  psychologist at SCI-Greene.  I would like to add that what Mr.

20  Rankine has just reported was factually incorrect.  I was there

21  with the conversation with Dr. Conn, Mr. Rankine was reporting

22  that he felt that his coffee was his way of medicating himself

23  rather than to take the antidepressant Zoloft.  Dr. Conn

24  reported that is an inappropriate way to medicate yourself and

25  that should he feel compelled to accept treatment, that he

1    would be more than willing to provide it.  Mr. Rankine also

2    does carry a psychiatric diagnosis of major depression.

3    Currently he is not compliant with treatment.

4            MR. RANKINE:  Your Honor -- Dr. Sacks, I have been

5    asking for my antidepressant ever since April 14th, when I was

6    terminated.  Dr. Sacks, do you recall me ever complaining that

7    my antidepressant -- my Zoloft was being crushed before it was

8    given to me?

9            DR. SACKS:  We had conversations on that, sir.  The

10   reason why your medication was discontinued was a combination

11   of your noncompliance and the fact that it is no longer carried

12   by the formulary.

13           MR. RANKINE:  Dr. Sacks --

14           THE COURT:  Hold on one second, let me ask you a

15   question.  There is substitute medication on the formulary now?

16           DR. SACKS:  Yes, your Honor, we have several that

17   Dr. Conn has been willing to prescribe for Mr. Rankine.  But

18   Mr. Rankine has been steadfastly against this.

19           MR. RANKINE:  Your Honor, that's not true.  I have

20   been asking for medication and I file grievances in asking for

21   my Zoloft to be continued -- it has been denied.

22           THE COURT:  Mr. Rankine, do you understand that they

23   no longer have Zoloft, are you willing to take a substitute

24   antidepressant?

25           MR. RANKINE:  Yes, ma'am.

35

1          THE COURT:  You're willing to work with what

2     Dr. Conn prescribes, no matter whether you've had it before?

3          MR. RANKINE:  Prozac makes my brain race and my

4     speech pattern rapid, so I cannot take Prozac.  That's why my

5     doctor put me on Zoloff.  That's what I was taking at Somerset

6     and Albion.  When I came here -- I personally believe I need my

7     medication and I asked for it.  And this morning Dr. Conn was

8     passing my door, I run to the door and called Dr. Conn, he

9     didn't talk to me.  I asked Dr. Conn, would you please resume

10    my Zoloff.

11         THE COURT:  Well, you know you're not going to get

12    Zoloff, it is no longer provided, you won't get that, so get

13    over that.

14         MR. SACKS:  At all occasions where Dr. Conn has in

15    fact recommended treatment, Mr. Rankine has refused treatment,

16    demanding that his Zoloff be reinstated.

17         THE COURT:  All right.  Mr. Englesberg, do you have

18    anything else for Mr. Rankine?

19         MR. ENGLESBERG:  No, your Honor.

20         MR. RANKINE:  Your Honor, if I could just ask Dr.

21    Sacks.  Dr. Sacks, do you recall that I have a very bad heart

22    problem, cholesterol is very high and I have chest pains, do

23    you recall that?

24         MR. SACKS:  I am not a medical doctor, I am not

25    qualified to evaluate your medical condition.  I am a

36

1    psychiatrist.

2              THE COURT:  Dr. Conn had prescribed the medicine?

3              MR. SACKS:  Yes.

4              THE COURT:  You have to talk to Dr. Conn about this.

5    He is just reporting what Dr. Conn suggested using, but you

6    would not accept it.

7              MR. RANKINE:  No, your Honor, I have not refused any

8    medication, he never spoke to me the last time.

9              THE COURT:  It's time for you to put in a request to

10   see Dr. Conn and it's time for you to get on medication, sir.

11   And take the medication that the doctor prescribes.

12             MR. RANKINE:  I want my medication, I need my

13   medication, I am not getting my medication.

14             THE COURT:  You're going to see Dr. Conn.  According

15   to the records, you have been very uncooperative.

16             MR. RANKINE:  That is incorrect.

17             THE COURT:  All right, I'm going to rule now on

18   document number 60, in which plaintiff, Derrick Rankine, has

19   requested an emergency order, that we have construed it as a

20   request for a temporary restraining order or preliminary

21   injunction, against defendants Henry, Coy, Schnap, Blaker,

22   Engelhardt, Thompson, Johnson, Bomberger, Stickles, Grego,

23   Bowlin, Hendersen, Anderson, Tanner, Santoyo, Folino, Davis,

24   Sacks, Ivan, Grainey, Smith, Martin, Cappossi, Leggett and

25   Meighen.  He asks that the order read that the retaliatory acts

1   be stopped and that he be released from RHU, where he is being,

2   as he alleges, abused.

3          My recommendation is as follows.  I recommend that

4   the motion, docket number 60, which is construed as a motion

5   for injunctive relief, be denied.

6          The four factors that must be shown for the issuance

7   of a temporary restraining order or preliminary injunction are:

8   (1) the likelihood of success on the merits; (2) the extent of

9   irreparable injury from the alleged misconduct; (3) the extent

10  of harm to the movant; and (4) the effect on public interest.

11  I cite the case of <u>Clean Ocean Action v. York</u>, 57 F.3d 328, 331

12  (3rd Cir. 1995).  The preliminary injunction remedy is reserved

13  for the most extraordinary circumstances.  I cite the case

14  <u>Hoxworth v. Blinder, Robinson & Co. Inc.</u>, 903 F.2d 186, 189

15  (3rd Cir. 1990).

16         If the record does not support a finding of both

17  irreparable injury and a likelihood of success on the merits,

18  then a preliminary injunction cannot be granted.  I cite the

19  case <u>Marxe v. Jackson</u>, 833 F.2d 1121 (3rd Cir. 1987).

20  Irreparable injury is established by showing that plaintiff

21  will suffer harm that "cannot be redressed by a legal or an

22  equitable remedy following trial."  <u>Instant Air Freight Co. v.</u>

23  <u>C.F. Air Freight, Inc.</u>, 882 F.2d 797, 801 (3rd Cir. 1989).

24         The testimony that was received today was consistent

25  in denying that any retaliatory acts had been undertaken

38

1   against plaintiff.  Plaintiff charges that all defendants who

2   testified today were lying.  However, all were placed under

3   oath, and the court finds their testimony credible.  Therefore,

4   there is no way that the plaintiff can show a likelihood of

5   success on the merits or that irreparable injury will ensue.

6          You have 10 days from today's date, Mr. Rankine, to

7   object to this recommendation to the district judge by writing

8   an objection.  And then the district judge will take that into

9   account, plus the recommendation I just made, and issue a final

10  order on your motion.

11         MR. RANKINE:  Could I place my objection on the

12  record now, I don't have typing paper, carbon paper to write

13  this motion in 10 days?

14         THE COURT:  You may do so.

15         MR. RANKINE:  I'm going to ask for an extension.

16         THE COURT:  Do it on the record now, rather than an

17  extension.

18         MR. RANKINE:  Can I do it for the record now?

19         THE COURT:  You may do so, go ahead.

20         MR. RANKINE:  One, the Supreme Court ruled that it

21  is always in the public's interest for correctional officers to

22  obey the law.  These officers deliberately under oath today --

23  and they intend to harm me, C.O. Engelhardt on the 21st of

24  November hit me because I tell him, he did not want to call the

25  lieutenant.  C.O. Engelhardt told me this morning I'm going to

1    die.  Gave me a cup of coffee with spit in it.  Told me when

2    tomorrow comes, see what he's going to do.  For those reasons,

3    I seriously believe my life is in grave, grave danger.  I don't

4    think this is a game.  I don't find C.O. Engelhardt, C.O.

5    Blaker, C.O. Stickles and C.O. Thompson's behavior conducive to

6    any sort of form -- or just joking.  I find their threats,

7    constant threats, constant harassment, very threatening.  I am

8    living in total fear of these men.  And the superintendent is

9    not in control of the prison.  And they're not doing anything

10   about grievances.  Like they admitted, I filed 190 grievances,

11   they don't respond to them.  Because I use me and my name.  So

12   the court's aware, I cannot get any form of redress in

13   SCI-Greene on these problems.  Like Mr. Blaker says, I never

14   give a sick call slip to medical when he assaulted me.  What

15   will happen the next time they assault me, they will just throw

16   the record away and say I never requested it.  I'm asking the

17   court to reconsider in denying my motion for protective custody

18   from these gentlemen, is leaving me at the mercy of these men.

19   And it doesn't matter if I file a grievance or complaint.

20   They'll discharge the grievance.  I am seriously in extreme

21   fear of C.O. Blaker, C.O. Stickles, C.O. Engelhardt.  Also,

22   from what happened this morning, his response to me, I am

23   definitely afraid of him.

24            THE COURT:  All right.  Then that is so noted and

25   that will be on the record that is reviewed by the district

40

1    judge when he makes his final order.  I appreciate the time you

2    have all taken today, the hearing went a little longer than I

3    expected.  Thank you very much, Mr. Englesberg, for making it

4    happen.  We're adjourned.

5

6

7            (Whereupon, at 3:57 p.m., the proceedings were

8    concluded.)

9

10                              -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

1                         C E R T I F I C A T E

2

3

4       I, Ronald J. Bench, certify that the foregoing is a

5   correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10   _____

11   Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25